Michelle **FAHRENDORFF**, By and Through her parent and natural guardian, **Russell FAHRENDORFF**, petitioner, Appellant,

v.

**NORTH HOMES, INC., d/b/a I.T.A.S.K.I.N. House,** Respondent.

No. C0–98–129.

Supreme Court of Minnesota.

Aug. 5, 1999.

---

Gerald W. VonKorff, Rinke-Noonan, St. Cloud, for appellant.

Patricia Kuderer, Hoff, Barry & Kuderer, Eden Prairie, for respondent.

Children's Law Center of MN, Gail Chang Bohr, Samantha Gemberling, St. Paul, Laurie J. Miller, Cynthia Jokela, Fredrikson & Bryon, P.A., Minneapolis,

for amicus curiae, Children's Law Center of Minnesota.

Bruce A. Beneke, Janet C. Werness, Southern MN Reg. Legal Serv., St. Paul, for amicus curiae Southern Minnesota Regional Legal Services and the Minnesota Coalition for Battered Women.

Ellen G. Sampson, Daniel L. Palmquist, Leonard Street & Deinard, P.A., Minneapolis, for amicus curiae NonProfit Insurance Ass'n.

Samuel E. Orbovich, Orbovich & Gartner Chartered, St. Paul, for amicus curiae Minnesota Council of Child Caring Agencies.

## OPINION

GILBERT, Justice.

This is an appeal from a court of appeals decision affirming summary judgment in favor of respondent. We must determine whether there exist any genuine issues of material fact or errors in the application of the law with respect to appellant's claim that the sexual assault committed by an employee of respondent fell within the scope of his employment. When viewed in the light most favorable to the appellant, the evidence suggests that the source of the assault was related to the employment duties of the assailant-employee. Accordingly, we reverse and remand for trial.

Respondent North Homes, Inc. is a nonprofit corporation that owns and operates the I.T.A.S.K.I.N. House, a temporary crisis shelter, i.e., group home. I.T.A.S.K.I.N. House is licensed by the Minnesota Department of Corrections and the Minnesota Department of Human Services to provide 24–hour residential care for up to seven persons under the age of 18. On April 10, 1995, Michelle Fahrendorff, then 15 years old, was placed in I.T.A.S.K.I.N. House on a 72–hour hold after she reported an argument she had with her parents to the Aitkin County Sheriff's Department. *See* Minn.Stat. § 260.165, subd. 1(c)(2) (1998). After a hearing on April 13, 1995, Fahrendorff's stay was extended to April 18. *See* Minn. Stat. § 260.172, subd. 1 (1998). While at I.T.A.S.K.I.N. House, Fahrendorff was sexually assaulted by David Kist, a program counselor at the home. Her claims against North Homes stem from that assault.

Kist was hired as a program counselor at I.T.A.S.K.I.N. House in December 1993. North Homes conducted a criminal background check as required by the Department of Human Services. *See* Minn.Stat. § 245A.04, subd. 3 (1998); Minn. R. 9543.0040, subp. 3 (1997). These checks revealed that Kist had no criminal history. North Homes also contacted several of Kist's former employers and personal references, none of whom gave any indication that Kist was unfit for the program counselor position.

Program counselors at I.T.A.S.K.I.N. House fulfilled the role of "group home parents" as defined in Minn. R. 9545.1420, subp. 4 (1997). According to North Homes' policy manual, counselors were responsible "for the management, supervision and attention of youth placed in the shelter's care" and were to help "provide a safe and secure environment for shelter residents." Counselors working the midnight shift were required to perform multiple "bed checks" of residents each night and had complete access to the residents' bedrooms for that purpose. Counselors, however, were instructed to avoid physical contact with residents whenever possible to prevent questions of inappropriate contact. North Homes also instructed counselors to avoid relationships that "might increase risk of client/resident exploitation in any form," and counselors were required to report any physical or sexual abuse of residents.

At Kist's six-month review, his supervisor rated Kist's performance as "satisfactory." In the summer and fall of 1994,

however, two complaints were lodged against Kist alleging improper conduct toward female residents. North Homes spoke to Kist about the incidents and noted them in Kist's personnel file, but determined that no disciplinary action was necessary.

On April 15, 1995, Kist was scheduled to work the midnight to 8:00 a.m. shift at I.T.A.S.K.I.N. House. At that time, Fahrendorff and two juvenile males were the only residents of I.T.A.S.K.I.N. House. Consistent with I.T.A.S.K.I.N. House's policy of maintaining a ratio of one counselor for every four residents, Kist was the only program counselor on duty that morning.

Shortly after he came on duty, Kist let an unauthorized male friend into I.T.A.S.K.I.N. House. The two began drinking beer and making a lot of noise. Eventually, Fahrendorff, who had gone to bed, went upstairs to where Kist and his friend were and asked the men to be quiet so she could sleep. Fahrendorff then returned to her room. Kist later went to Fahrendorff's bedroom, offered her a cigarette, and asked her not to say anything about his behavior. He told her that he would shut off the smoke alarms so that she could smoke the cigarette. Fahrendorff accepted the cigarette, went to the bathroom to smoke it, and then returned to bed.

Either shortly after Fahrendorff first asked Kist and his friend to be quiet or shortly after Kist gave Fahrendorff the cigarette, Kist's friend left. At that point, Kist was the only employee and the only adult in I.T.A.S.K.I.N. House. Fahrendorff was alone in her room and the two juvenile male residents were upstairs in a separate bedroom.

Sometime during the early morning hours of April 15, Kist returned to Fahrendorff's room carrying two cans of beer. Kist offered one of the beers to Fahrendorff who accepted it. Kist then sat on Fahrendorff's bed and began talking with her. He told Fahrendorff that he would help her to get released from I.T.A.S.K.I.N. House, that he could help her get emancipated from her parents, and that he would take care of her. Eventually the nature of the conversation changed and Kist began telling Fahrendorff that she was "pretty" and "hard to resist." Kist then kissed Fahrendorff and began making other sexual advances towards her.

Kist left Fahrendorff's room several times thereafter to answer the house phone but each time returned and continued to make sexual advances towards Fahrendorff. Fahrendorff tried to refuse Kist's advances and at one point went upstairs to the room of the two juvenile male residents for help, but the male residents refused to let her stay in their room. Over the course of his shift, Kist repeatedly kissed Fahrendorff, touched her breasts with his hands and mouth, and touched her genitals over her clothes. In I.T.A.S.K.I.N. House's daily shift log, however, Kist reported that Fahrendorff had "slept all night."

Fahrendorff did not report the incident to the female counselor who was on duty from 8:00 a.m. to 4:00 p.m. on April 15. Kist again came on duty at approximately 4:00 p.m. According to Fahrendorff's original statement to the police, Kist asked her several times during this shift if he could "hold" her again that evening but there was no further sexual contact. In a subsequent deposition, however, Fahrendorff said that Kist kissed her on her cheek on the evening of April 15.

On April 16, 1995, Easter Sunday, Fahrendorff was permitted to leave I.T.A.S.K.I.N. House to have dinner with her family. She told her family about Kist's actions and her parents took her to the Itasca County Sheriff's Department where Fahrendorff reported the incident. Kist was immediately suspended from duty. North Homes and the sheriff's department investigated the incident. North Homes terminated Kist on May 26, 1995. Kist subsequently pled guilty to charges of

introducing contraband into a correctional facility in violation of Minn.Stat. § 641.165, subd. 2(a) (1998), and second-degree criminal sexual conduct in violation of Minn. Stat. § 609.343, subds. 1(b), 2 (1998).

On December 30, 1996, Fahrendorff served a civil complaint against North Homes. In the complaint, Fahrendorff alleged that North Homes was liable for assault and battery, sexual abuse, and infliction of emotional distress under doctrines of respondeat superior and aiding and abetting. Fahrendorff also asserted a general claim of negligence and claims of negligent supervision, training, retention, and hiring.

North Homes moved for summary judgment on all counts. In response, Fahrendorff submitted an affidavit from John Krueger, the director of the St. Cloud Children's Home and a licensed psychologist and social worker, who had worked in the area of juvenile residential care since 1974. Among the statements set forth in Krueger's affidavit was his conclusion that, "inappropriate sexual contact or abuse of power in these situations, although infrequent, is a well known hazard in this field."

The trial court granted summary judgment in favor of North Homes, concluding that Fahrendorff had failed to raise any issue of material fact with respect to any of her claims and that North Homes was entitled to judgment as a matter of law. With respect to Fahrendorff's respondeat superior claim, the court concluded that "[t]he sexual contact was for Kist's personal sexual gratification and was not in furtherance of his employment duties." Thus, the court concluded Kist was not acting within the scope of his employment when he committed the assault, and North Homes could not be held liable for Kist's acts. The court also ruled that Krueger's affidavit was insufficient to create a factual question as to whether Kist's abuse was foreseeable by North Homes because it "state[d] no opinion on whether it was foreseeable that David Kist would commit an act of sexual abuse."

The Minnesota Court of Appeals affirmed the summary judgment order of the trial court. With respect to Fahrendorff's respondeat superior claims, the court concluded that "Kist's actions were criminal and conducted purely for his own personal gratification" and thus fell outside the scope of his employment. Like the trial court, the court of appeals determined that Krueger's affidavit was insufficient to create a material question of fact on the issue of whether Kist's abuse was foreseeable.

■ On appeal to this court, Fahrendorff makes two arguments. First, she asserts that the evidence was sufficient to raise a material question of fact with respect to the elements of her respondeat superior claim. Second, she argues that, as a matter of public policy, group homes should be held strictly liable for the sexual assault of a minor resident by its employee. Fahrendorff, however, did not raise the issue of strict liability in her pleadings. As a general rule, we will not consider an issue raised for the first time on appeal. *See Steenberg Constr. Co. v. Rohr*, 296 Minn. 512, 513, 207 N.W.2d 722, 723 (1973). We therefore decline to address the strict liability issue and limit our analysis to Fahrendorff's respondeat superior claim.

■ "[S]ummary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact' and either party is entitled to judgment 'as a matter of law.'" *W.J.L. v. Bugge*, 573 N.W.2d 677, 680 (Minn.1998) (quoting Minn. R. Civ. P. 56.03). On appeal from a grant of summary judgment, the reviewing court is to determine whether genuine issues of material fact exist and whether the trial court erred in its application of the law. *See State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). We must consider the evidence in the light most favorable to the party against whom summary judgment

was granted. *See Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.1995).

Under the "well-established principle" of respondeat superior, "an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." *Schneider v. Buckman,* 433 N.W.2d 98, 101 (Minn.1988). Such liability stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business. *See Lange v. National Biscuit Co.,* 297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973). As we have interpreted the doctrine in Minnesota, an employer may be held liable for even the intentional misconduct of its employees when (1) "the source of the attack is related to the duties of the employee," and (2) "the assault occurs within work-related limits of time and place." *Id.* at 404, 211 N.W.2d at 786.

In the present case, neither party disputes that Kist's sexual assault of Fahrendorff occurred within work-related limits of time and place. Thus, we focus our analysis on whether the source of Kist's assault was related to the duties of his employment.

Both of the lower courts determined that because Kist's acts were prohibited, illegal, and performed for personal gratification, they were not within the scope of his employment. In *Lange,* however, we held that an employee's act need not be committed in furtherance of his employer's business to fall within the scope of his employment. *See id.* at 404, 211 N.W.2d at 786. Instead, we recognized that:

> [t]he master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is *so connected with and immediately grows out of another act of the servant imputable to the master,* that both acts are treated as one indivisible tort.

*Id.* at 404, 211 N.W.2d at 785–86 (quoting *Gulf, C. & S.F. Ry. v. Cobb.,* 45 S.W.2d 323, 326 (Tex.Civ.App.1931)). We reaffirmed that holding in *Marston v. Minneapolis Clinic of Psychiatry and Neurology,* 329 N.W.2d 306 (Minn.1982), where we held that "the employee's motivation should not be a consideration for imposition of vicarious liability." *Id.* at 311.

*Marston* concerned the liability of a clinic-employer for the damages caused by a psychologist-employee who had engaged in sexual misconduct with several patients at the clinic during and immediately after therapy. *See id.* at 308. In summarizing the evidence, we noted that "sexual contact or relationship with a patient [was] absolutely forbidden" by the clinic. *Id.* Moreover, "there was uncontradicted testimony that any sexual contact or relationship with a patient is totally unethical, of no therapeutic purpose, purely personal and strictly proscribed by the Code of Ethics of the American Psychological Association." *Id.* Still, we held the evidence was sufficient to raise a question of material fact as to whether the psychiatrist's conduct fell within the scope of his employment. *See id.* at 311. In so holding, we noted that the sexual misconduct would not have occurred but for the psychiatrist's employment, occurred during or after regular therapy sessions, and was preceded by normal therapeutic massage. *See id.* We also noted that there was "testimony that sexual relations between a psychologist and a patient is a well-known hazard and thus, to a degree, foreseeable and a risk of employment." *Id.* Because of this evidence, we held that "it should be a question of fact whether the acts of [the psychologist] were foreseeable, related to and connected with acts otherwise within the scope of employment." *Id.*

We again addressed the issue of an employer's liability for the sexual misconduct of an employee in *P.L. v. Aubert,* 545 N.W.2d 666 (Minn.1996). *Aubert* concerned the liability of a school district for the misconduct of a teacher who had sexu-

al relations with a minor student on the school premises and, at times, during class hours. *See id.* at 667. Looking at the evidence presented, we held that no factual question existed as to whether the teacher's acts fell within the scope of her employment and affirmed summary judgment in favor of the school. *See id.* at 668. We distinguished *Marston,* on grounds of foreseeability:

> It was the foreseeability of the risk that determined the outcome of the *Marston* case.
>
> Here we find no evidence that such relationships between teacher and student are a "well-known hazard"; thus foreseeability is absent. While it is true that teachers have power and authority over students, no expert testimony or affidavits were presented regarding the potential for abuse of such power in these situations; thus there can be no implied foreseeability.

*Id.*[1]

 Examining the evidence in the light most favorable to Fahrendorff, we conclude that a reasonable jury could find that the source of Kist's assault was related to the duties of his employment. Although Kist's sexual assault of Fahrendorff was criminal and personally motivated, the lower courts erred in relying on those factors to grant North Homes' motion for summary judgment. As we held in *Marston,* just because an employee's ultimate actions may be motivated by personal gratification and prohibited by the employer does not mean that those actions fall outside the scope of employment as a matter of law. *See* 329 N.W.2d at 311. Rather, it is a question of fact whether the employee's acts were foreseeable, related to, and connected with acts otherwise within the scope of his employment. *Id.*

Like the employee in *Marston,* Kist's assault would not have occurred but for his employment. As a program counselor, Kist fulfilled the role of a "group home parent" to Fahrendorff. *See* Minn. R. 9545.1420, subd. 4. In that position, Kist held significant power and authority over Fahrendorff. Kist's job enabled him to be alone with Fahrendorff, to have unfettered access to her bedroom, and to conceal, at least for a short time, his criminal conduct. The record contains evidence that Kist used this authority on two successive nights to enter Fahrendorff's room and have sexual contact with her.

The record also indicates that Kist initiated his advances toward Fahrendorff by talking to her about her situation with her parents and telling her he could help her get out of the group home. Such conversation related directly to the reason Fahrendorff was at I.T.A.S.K.I.N. House. Therefore, the source of Kist's attack lay in activity that was directly related to his legitimate counselor duties. Thus, as in *Marston,* there is evidence that Kist's assault, although wrong and illegal, was connected with or related to seemingly legitimate employment activities.

Additionally, viewed in the light most favorable to Fahrendorff, the evidence raises a factual question as to the foreseeability of sexual abuse in group homes. In response to North Homes' motion for summary judgment, Fahrendorff submitted the affidavit from Krueger, a purported expert in the group home industry, expressly stating that "inappropriate sexual contact or abuse of power in [group home] situations, although infrequent, is a *well known hazard in this field.*" (emphasis added). This sworn statement, although somewhat conclusory and lacking specific

---

1. Our decision in *Aubert* was based solely on the lack of evidence presented in that case showing that sexual assaults of students by teachers were a "well-known hazard." We note that subsequent to our decision in *Aubert,* the United States Supreme Court stated in a Title IX case that "[t]he number of re-ported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 2000, 141 L.Ed.2d 277 (1998).

examples, is nearly identical to the testimony we relied on in *Marston* in holding that a question of material fact existed on the issue of foreseeability. *See* 329 N.W.2d at 311. Moreover, this affidavit is the exact type of evidence of foreseeability we found to be lacking in *Aubert. See* 545 N.W.2d at 668.

An affidavit supporting a motion in opposition to summary judgment must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Minn. R. Civ. P. 56.05. In the past, we have found affidavits to be insufficient to raise a question of material fact if they merely stated legal or factual conclusions without providing a basis for the affiants' knowledge and without making any showing that the affiants were competent to testify as to the matters stated. *See Federal Ins. Co. v. Pratt's Express,* 308 Minn. 282, 283–84, 241 N.W.2d 488, 489 (1976); *Peterson v. American Family Mut. Ins. Co.,* 280 Minn. 482, 487, 160 N.W.2d 541, 544–45 (1968).

Here, Krueger's affidavit indicates that the claims made therein are the product of personal knowledge gained during 23 years of employment and management in group homes. Given these credentials, Krueger appears competent to testify as an expert on the issues and concerns facing the group home industry. Because Krueger's claims are the product of personal knowledge and Krueger would be qualified to make the same claims in front of a jury, his affidavit is sufficient to raise a question of fact on the foreseeability of sexual abuse in the group home industry.

■ We concede that Krueger's affidavit does not contain information specific to Kist or I.T.A.S.K.I.N. House.[2] Such information, however, is not necessary to establish foreseeability in respondeat superior cases. Contrary to liability based on negligence, liability based on respondeat superior stems from public policy rather than from any fault of the employer. *See Lange,* 297 Minn. at 403, 211 N.W.2d at 785. If we were to predicate liability in respondeat superior cases upon a showing that the employer should have reasonably anticipated the employee's specific misconduct, this distinction would be lost. Accordingly, other jurisdictions that, like us, use foreseeability as a consideration in determining respondeat superior liability, have distinguished the degree of foreseeability required in the respondeat superior context from that required in direct negligence cases:

> "foreseeability" in this context must be distinguished from "foreseeability" as a test for negligence. In the latter sense "foreseeable" means a level of probability which would lead a prudent person to take effective precautions whereas "foreseeability" as a test for *respondeat superior* merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.

*Rodgers v. Kemper Constr. Co.,* 50 Cal. App.3d 608, 124 Cal.Rptr. 143, 148–49 (Ct. App.1975).

Here Krueger's affidavit stated that sexual abuse by group home parents, although infrequent, is a "well known hazard" in the group home industry. This sworn statement suggests that sexual abuse by a group home parent is sufficiently common in the group home industry that, as a matter of fairness, an employer engaged in that business should bear the loss associated with such abuse as a foreseeable cost of doing business. Thus, as we recognized in

---

**2.** We do not, however, concur with the dissent's statement that "[t]here is nothing in the record to suggest that Kist's conduct was anything but unusual or startling." While the information is more relevant to a direct liability action than a respondeat superior claim, the record does show that two prior allegations of sexual misconduct against other female residents were levied against Kist during his employment at I.T.A.S.K.I.N. House.

*Marston,* testimony such as Krueger's does create a genuine issue of fact as to whether an employee's tort is foreseeable. *See* 329 N.W.2d at 311.

While the above evidence is not conclusive proof that Kist's acts were within the scope of his employment, we hold, as we did in *Marston,* that the evidence does raise a question of fact as to whether Kist's wrongful acts were foreseeable, related to and connected with acts otherwise within the scope of employment. Accordingly, we reverse the decision of the court of appeals on this issue and remand the case for trial.

Reversed and remanded.

LANCASTER, J., took no part in the consideration or decision of this case.

PAGE, Justice (concurring specially).

While I agree with the result reached by the court, I write separately to express my belief that North Homes should be held strictly liable for Kist's actions. The court declines to address Fahrendorff's argument that North Homes is strictly liable because Fahrendorff did not raise the issue in her pleadings. While litigants are usually bound by the theory presented to the district court, we may base our decision upon a theory not presented "where the question raised for the first time on appeal is plainly decisive of the entire controversy on its merits, and where * * * there is no possible advantage or disadvantage to either party in not having had a prior ruling by the trial court on the question." *Holen v. Minneapolis–St. Paul Metro. Airports Comm'n,* 250 Minn. 130, 135, 84 N.W.2d 282, 286 (1957) (citations omitted). Here, the question of whether North Homes had a legal duty to act for Fahrendorff's protection such that they should be held strictly liable is a question of law that was fully briefed in this court

by both parties and fully argued in the district court.[1] Therefore, I would address the issue on its merits.

"In order to create absolute liability, [we must find] that the legislative purpose of * * * a statute is to protect a limited class of persons from their own inexperience, lack of judgment, inability to protect themselves or to resist pressure, or tendency toward negligence." *Zerby v. Warren,* 297 Minn. 134, 139, 210 N.W.2d 58, 62 (1973). Minnesota Statutes § 260.011 (1998), provides in relevant part:

> Subdivision 2(a). The paramount consideration in all proceedings concerning a child alleged or found to be in need of protection or services is the health, safety, and best interests of the child. * * * The purpose of the laws relating to juvenile courts is to secure for each child alleged or adjudicated in need of protection or services and under the jurisdiction of the court, the care and guidance * * * as will best serve the spiritual, emotional, mental, and physical welfare of the child; * * * and, when removal from the child's own family is necessary and in the child's best interests, to secure for the child custody, care and discipline as nearly as possible equivalent to that which should have been given by the parents.

Minn.Stat. § 260.011, subd. 2(a).

One of the purposes of section 260.011 is to protect children adjudicated in need of protection from physical harm. Fahrendorff is a child who was admitted, pursuant to a court order, to a 24–hour residential program because the juvenile court determined that removal from her family was necessary and in her best interests. As a provider of services for children in need of protection, North Homes had an absolute duty to protect Fahrendorff's health, safety, and best interests and to provide care "as nearly as possible * * * to that which

---

1. A review of the record makes it clear that both parties argued the issue of strict liability during the hearing on North Homes' summary judgment motion. Thus, it is somewhat inaccurate for the court to contend that Fahrendorff first raised the issue of strict liability on appeal.

should have been given by [her] parents." *Id.* North Homes failed to protect Fahrendorff from Kist's sexual assault. Thus, North Homes should be held strictly liable for any injuries Fahrendorff suffered as a result of that sexual assault.

RUSSELL A. ANDERSON, J. (concurring in part and dissenting in part).

I concur with the majority that the appellant's failure to raise the issue of strict liability in its pleadings precludes our consideration on appeal, but I respectfully dissent from the majority's conclusion that the evidence presented in this case creates a genuine issue of material fact such that North Homes, Inc., could be held vicariously liable for the conduct of David Kist. Thus, I would affirm the judgments of the district court and the court of appeals.

Two reasons lead me to depart from the judgment of the majority: (1) the affidavit of John Krueger, even if accepted as true, fails to create a genuine issue of material fact because the affidavit fails to provide a basis that would permit a jury to find, by the greater weight of the evidence, that Kist's conduct was foreseeable; and (2) North Homes should not be held liable for Kist's actions because the assault did not occur within the scope of Kist's employment and was unrelated to his job duties.

Summary judgment is appropriate if the pleadings, depositions, answers, admissions and affidavits show there are "no genuine issue[s] as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03; *see also DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn.1997). On review, we determine "(1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law." *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990).

A material fact is one that will affect the outcome or result of a case. *See O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn.1996). A genuine issue of material fact "must be established by 'substantial evidence.'" *Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976). We have said that a factual dispute does not exist when:

> The nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions.

*DLH*, 566 N.W.2d at 71. To prevent summary judgment, "the nonmoving party must do more than rely on 'unverified or conclusory allegations' in the pleadings or postulate evidence which might be produced at trial." *W.J.L. v. Bugge*, 573 N.W.2d 677, 680 (Minn.1998) (quoting *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn.1995)).

The majority reverses the lower courts by holding that Krueger's affidavit raises a genuine issue of material fact for a jury to resolve regarding the foreseeabilty of Kist's conduct. As a threshold matter, it should be noted there is no evidence in the record that even hints that North Homes failed to comply with regulations that require it to conduct a criminal background check on its employees and that prohibit it from placing an employee convicted of a sex crime in contact with residents. In fact, appellant did not appeal from the lower courts' determination that all claims of negligence on the part of North Homes be summarily dismissed.

Further, while the majority concedes that the Krueger affidavit lacks any information specific to Kist or I.T.A.S.K.I.N. House, it relies upon North Homes' failure to contradict the affidavit as grounds for reversing the district court and the court of appeals. The majority ignores the procedural posture of the case by placing a burden on North Homes. North Homes moved for summary judgment, and appellant submitted the Krueger affidavit in opposition to North Homes' motion. Affidavits opposing summary judgment do not

create genuine issues of material fact if they merely recite conclusions. *See Peterson v. American Family Mut. Ins. Co.,* 280 Minn. 482, 487, 160 N.W.2d 541, 544–45 (1968). "The nonmoving party must present specific facts which give rise to a genuine issue of material fact for trial." *W.J.L.,* 573 N.W.2d at 680.

Krueger's affidavit recites that sexual assaults by counselors are "infrequent" but also are a "well known hazard" and that it is "entirely foreseeable" that such assaults "could" happen. The affidavit also states that such assaults are a "recognized possibility" and there is "potential" for such abuse. Krueger also admits in his affidavit that it is not "possible to predict which individual counselor would engage in inappropriate conduct." Krueger continues that an employer such as North Homes could not "reasonably anticipate" such assaults or who could commit such an act. It is on this skimpy expert testimony that the majority extends the doctrine of respondeat superior to the facts of this case despite Krueger's failure to provide any factual basis for his conclusions. As the majority concedes, Krueger does not even mention I.T.A.S.K.I.N. House, Kist, Kist's duties, or any statistical support for his terming sexual assaults a "well known hazard." Kist's affidavit is at best conclusory and at worst contradictory.

While our case law has failed to precisely define "foreseeability," Black's defines it as:

The ability to see or know in advance; *e.g.* the reasonable anticipation that harm or injury is a likely result from certain acts or omissions.

*Black's Law Dictionary,* 649 (6th ed.1990). Krueger's affidavit equates "foreseeability" with "possibility" and "potential."[1] The majority's acceptance of Krueger's affida-

vit does the same thing and extends respondeat superior beyond the limitations of our prior decisions. As the California courts have stated:

'foreseeability' as a test for *respondeat superior* merely means that in the context of the particular enterprise an employee's conduct is not so *unusual* or *startling* that it would seem unfair to include the loss resulting from it among other costs of the employer's business.

*John R. v. Oakland Unified Sch. Dist.,* 48 Cal.3d 438, 256 Cal.Rptr. 766, 769 P.2d 948, 964 (Cal.1989) (Kaufman, concurring and dissenting) (quoting *Rodgers v. Kemper Constr. Co.,* 50 Cal.App.3d 608, 124 Cal.Rptr. 143, 148–49 (Ct.App.1975)).

There is nothing in the record to suggest that Kist's conduct was anything but unusual or startling. Krueger's affidavit summarily deems the conduct as a possibility. It lacks any indication of personal knowledge of the facts of this case as required by the rules. *See* Minn. R. Civ. P. 56.05. Krueger's affidavit failed to report any other examples of such assaults, at I.T.A.S.K.I.N. House or elsewhere. As the California Supreme Court noted: sexual abuse may be "conceivable, but that is a far cry from foreseeability." *John. R.,* 256 Cal.Rptr. 766, 769 P.2d at 956.

Certainly the facts of *Marston v. Minneapolis Clinic of Psychiatry and Neurology,* 329 N.W.2d 306 (Minn.1982), do not support the majority's decision. In *Marston,* several experts appeared at trial, testifying that sexual relationships between doctor and patient—particularly where the doctor-patient relationship involved physical contact in the form of therapeutic massage—were a recognized hazard in psychiatry. *See id.* at 308. In *Marston,* we relied upon this trial testimony in conclud-

---

1. The best example of foreseeable conduct among our cases is *Lange v. National Biscuit Co.,* 297 Minn. 399, 211 N.W.2d 783 (1973). In *Lange,* a cookie salesman assaulted a grocer while placing his employer's product on the shelf and the record indicated that the employer had received complaints about the salesman's aggressive behavior. 297 Minn. at 400, 211 N.W.2d at 784. Thus, in *Lange* the salesman's behavior was within the scope of his employment, related to his duties, and foreseeable. The facts of this case are quite dissimilar.

ing that foreseeability of such sexual relationships was an appropriate fact question for the jury to resolve. *See id.* at 311. But the facts of this case are quite different. *Marston* was an appeal following a jury trial while here, on summary judgment, we are confronted with the conclusory affidavit of an expert that merely parrots the language of our decision in *Marston. See id.* at 307–09 (summarizing expert testimony that sexual relationship between psychiatrist and patient was a well known hazard). The Krueger affidavit, as a matter of law, is insufficient to raise a genuine issue of material fact. Furthermore, there was ample testimony in *Marston* to support the conclusion that the source of the attack was the psychiatrist's duties and in particular the use of therapeutic massage. There is no evidence in the record to support the notion that Kist was in any way performing any legitimate duties at the time of his assault on appellant.

Because Kist's conduct was not related to his job duties and because there is no evidence raising a genuine issue of material fact that Kist's acts were foreseeable, I would affirm summary judgment in favor of North Homes.

The majority, citing *Lange v. National Biscuit Co.*, 297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973), also turns to the policy behind the doctrine of respondeat superior when it states that an employer's liability "stems from public policy rather than from any fault of the employer." This policy determination should have limits, but the majority's interpretation of our case law leaves almost no barrier in Minnesota to recovery by persons injured by the criminal acts of employees when, as is the case here, there is no evidence of negligence on the part of the employer. A review of our decisions compels the conclusion that Kist's conduct, while reprehensible, was neither within the scope of his employment nor foreseeable.

The majority relies on our decision in *P.L. v. Aubert*, 545 N.W.2d 666 (Minn.

1996), to support its conclusion that appellant has raised a factual question requiring trial. But in *Aubert*, where a teacher engaged in a consensual sexual relationship with a student, we rejected an argument similar to appellant's and granted summary judgment in favor of the school district. 545 N.W.2d at 668. We stated that the sexual misconduct by the teacher "occurred within work-related limits of time and place." *Id.* However, we also stated that the "sexual contact by the teacher toward the student could not be considered an 'indivisible' act directly related to her teaching duties," so that liability of employer could not be imputed. *Id.* Here, the majority focuses on our language in *Aubert* discussing foreseeability, but *Aubert* plainly requires that the intentional tort be related to the duties of the employee.

It is true that in Minnesota, unlike other jurisdictions, we have held that an employee does not have to be acting in furtherance of the employer's business to fall within the scope of employment. *See Marston*, 329 N.W.2d at 311. Here, while it is undisputed that Kist's assault on appellant took place during the work-related limits of time and place, Kist's conduct was unrelated to his job duties. The record is devoid of evidence suggesting that Kist was in any way acting in accordance with his duties as a program counselor. While the majority contends that "the source of Kist's attack lay in activity that was directly related to his legitimate counselor duties," the record is clear that Kist's criminal conduct was purely self-gratifying. Rather than providing a safe and secure place for appellant during her stay at the shelter, Kist engaged in conduct outside the scope of his job duties by (1) sexually assaulting appellant; (2) drinking during his shift; (3) providing alcohol to appellant; (4) providing cigarettes to appellant; (5) disabling a smoke alarm so appellant could smoke; (6) allowing appellant to make telephone calls despite a "no phone contact" order; and (7) falsifying

the daily log record regarding the events of the night. This conduct by Kist was completely outside Kist's duties – in fact in direct contravention of his duties – and only served his personal agenda. The majority states that Kist's actions in talking to Fahrendorff prior to the assault "was connected with or related to seemingly legitimate employment activities." The connection between job duties and the assault should be stronger than connected to "seemingly legitimate" duties before subjecting an employer to liability in absence of any negligence on the part of the employer.

Under today's decision, which accepts the Krueger affidavit as raising a genuine issue of material fact, every employer in Minnesota whose employee commits an intentional or criminal act will be faced with a trial when a complaint alleges a claim sounding in respondeat superior. This approach fails to place limits or provide guidance regarding what is foreseeable conduct and stretches Minnesota law to accommodate an admittedly sympathetic plaintiff. Because Kist acted outside his job duties, and because appellant has not alleged specific material facts creating a question for a jury to resolve regarding the foreseeability of Kist's acts, I would affirm the court of appeals' decision affirming the district court's grant of summary judgment in favor of North Homes.

STRINGER, J. (concurring in part and dissenting in part).

I join in the concurrence and dissent of Justice Russell A. Anderson.